UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TADICH GRILL, INC., <br><br> Plaintiff, <br><br> v. <br><br> TADICH GRILL DEVELOPMENT COMPANY, LLC, et al., <br><br> Defendants. | Case No. 18-cv-02827-JSC <br><br> **ORDER RE: DEFENDANT TADICH GRILL DEVELOPMENT COMPANY, LLC'S MOTION TO COMPEL ARBITRATION AND MOTION TO STAY; DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY; PLAINTIFF TADICH GRILL, INC.'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Re: Dkt. Nos. 16, 18, 25, 31 |

Plaintiff Tadich Grill, Inc. ("TGI") brings causes of action against Defendants Tadich Grill Development Company, LLC ("TGDC"), ICON INC, ICONcepts LLC, Gerard Centioli, and Lauren Centioli ("non-TGDC Defendants") (collectively, "Defendants") for trademark infringement, cybersquatting, and false designation of origin.[1] (Dkt. No. 1.)[2] Now pending before the Court are Defendant TGDC's motion to compel arbitration and stay proceedings, or in the alternative, transfer venue to the United States District Court for the District of Oregon (Dkt. No. 16); the non-TGDC Defendants motion to dismiss and motion to stay (Dkt. Nos. 18 & 31); and Plaintiff's motion for preliminary injunction (Dkt. No. 25). After carefully reviewing the parties' briefing and having had the benefit of oral argument on August 23, 2018, the Court GRANTS TGDC's motion to compel arbitration; GRANTS the non-TGDC Defendants' motion to stay; and GRANTS in part Plaintiff's motion for a preliminary injunction. The Court dismisses without

---

[1] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 8, 32, 34.)

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

prejudice the non-TGDC Defendants' motion to dismiss.

BACKGROUND

## I.     The Parties

### A.     Plaintiff

Plaintiff TGI's Tadich Grill restaurant in San Francisco, California has been in continuous operation since 1849, making it "the oldest restaurant in California and third oldest continuously run restaurant in the United States." (Dkt. No. 1 at ¶ 14.) The current owner, Michael Buich, traces his family's ownership of the restaurant to 1913. (Dkt. No. 25 at 8.) Mr. Buich "has been the sole owner of TGI, which owns the Tadich Grill restaurant[,]" since 2002. (*Id.* at 8-9.)

Plaintiff has used the trademark "Tadich Grill" ("the Mark") in connection with its San Francisco restaurant since 1882. (Dkt. No. 1 at ¶ 13.) Records from the United States Patent and Trademark Office show that Plaintiff initially registered the Mark in May 1977 and received a 10-year renewal on June 19, 2017. (Dkt. No. 1 at 20.) In addition to the Mark, Plaintiff owns the domain names "www.tadichgrillsf.com and www.tadichgrill.com." (Dkt. No. 26 at ¶ 10.)

### B.     TGDC

TGDC is a Washington state limited liability company. (Dkt. No. 17-1 at 12.) It was created on January 22, 2009, pursuant to an Operating Agreement entered into by Michael Buich and ICONcepts LLC to "open and operate Tadich Grill restaurants based on the TG Concept." (*Id.*) The agreement designates Gerard Centioli as President and Chief Executive Officer ("CEO"). (*Id.* at 25, § 14.1).

### C.     ICON INC and ICONcepts LLC

ICON INC ("ICON") is a Nevada corporation. (Dkt. No. 47 at ¶ 1.) ICONcepts LLC ("ICONcepts") is "a Washington state limited liability company and affiliate of ICON." (*Id.*) ICON and ICONcepts "are food service companies engaged in acquiring rights to iconic restaurants and food service establishments and developing and growing those ventures in collaboration with the original concept's owners." (*Id.* at ¶ 3.)

### D.     Gerard Centioli

Gerard Centioli is the President and CEO of TGDC and ICON, and "a manager and the

2

President" of ICONcepts.  (Dkt. No. 47 at ¶ 1.)

### E.     Lauren Centioli

Lauren Centioli is the Treasurer and Secretary of ICON, and son of Gerard Centioli. (Dkt. No. 48 at ¶ 1.)

## II.     Factual Background

This case involves a restaurant deal gone sour.  On January 22, 2009, Plaintiff and Defendants entered into the following agreements: (1) Operating Agreement between Michael Buich and ICONcepts LLC establishing TGDC, (Dkt. No. 48-1, Ex. A); (2) License Agreement between Plaintiff and TGDC granting certain intellectual property rights to TGDC, (Dkt. No. 16-2); (3) Restaurant Management Agreement between Plaintiff, TGDC, and ICON INC for the management of Tadich Grill's original San Francisco restaurant, (Dkt. No. 48-1, Ex. B); and (4) Restaurant Management Agreement between TGDC and ICON for the management of future Tadich Grill restaurants, (Dkt. No. 48-1, Ex. C).

### A.     Agreements at Issue

#### 1.  Operating Agreement

As noted above, the Operating Agreement entered into by Michael Buich and ICONcepts LLC created TGDC to "open and operate Tadich Grill restaurants based on the TG Concept." (Dkt. No. 48-1, Ex. A at 6.)  The Operating Agreement designates Gerard Centioli as President and Chief Executive Officer ("CEO").  (*Id*. at 19, § 14.1).  Pursuant to the agreement, Michael Buich received a 25% ownership interest in TGDC, ICONcepts LLC received a 60% interest, and the remaining 15% was earmarked for "Designated Members of ICON Affiliates."[3]  (*Id*. at 45.)

#### 2.  License Agreement

Pursuant to the License Agreement, Plaintiff granted to TGDC intellectual property rights in the Mark and the domain name "tadichgrill.com" ("Domain Name") for use in the operation of to-be-opened Tadich Grill restaurants.  (*See generally* Dkt. No. 16-2.)  The License Agreement

---

[3] According to the declaration of Gerard Centioli, "ICONcepts has never designated additional persons to manage TGDC as contemplated in the Operating Agreement, so it has been managed based on the joint decisions of Mr. Buich and ICON."  (Dkt. No. 47 at ¶ 11.)

grants TGDC "an exclusive, perpetual, irrevocable, sublicensable license throughout the Territory[4] (and only in the Territory) during the Term[5] to Use the Licensed Mark[6] and the TG Concept[7] for the Business Purpose." (*Id*. at ¶ 2.1(a).) The License Agreement includes an arbitration provision, which states, in its entirety:

> Any controversy arising out of or relating to this Agreement shall be resolved by arbitration pursuant to the commercial rules of arbitration as prescribed by the American Arbitration Association. The panel of arbitrators appointed to settle any controversy or claim shall consist of three (3) arbitrators, unless the amount of the claim is less than One Hundred Thousand Dollars ($100,000), in which event only one (I) arbitrator shall be appointed. The arbitrators sitting in any such controversy shall have no power or jurisdiction to alter or modify any express provision of this Agreement or to make any award, which by its terms, affects any such alteration or modification. The venue for arbitration shall be Portland, Oregon, applying the laws of the State of California.

(*Id*. at ¶ 16.2(a).) The License Agreement also contains an arbitration "carve-out" provision that states, in its entirety:

> The provision for arbitration herein shall not be deemed a waiver of the rights of either party to any provisional remedy provided under California law for injunctive or declaratory judgment relief. It is agreed that in the event of any violation or threatened violation hereof, the other party hereto shall have the right to obtain a preliminary injunction enjoining further violation of this Agreement pending the arbitration hearing. Furthermore, the obligation to arbitrate shall not be binding upon either party with respect to claims relating to the Licensed mark or any copyright; requests by either party for a temporary restraining order, preliminary injunction or other procedure in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute between the parties.

(Dkt. No. 16-2 at ¶ 16.4.) On September 27, 2017, then-counsel for Plaintiff notified Defendants by letter that TGDC was in breach of License Agreement Section 11.3(b), and had "been for in

---

[4] The License Agreement defines "Territory" as "worldwide, except for (a) the country of Japan and (b) within the City and County of San Francisco, California." (Dkt. No. 16-2 at ¶ 1.26.)
[5] The "Term" of the agreement is defined as January 22, 2009 continuing "in perpetuity thereafter, subject to the termination provisions set forth" in the License Agreement. (*Id*. at ¶ 3.)
[6] "Licensed Mark" means intellectual property rights in the name "Tadich Grill" and the domain name "tadichgrill.com." (*Id*. at ¶ 1.14.)
[7] "TG Concept" is defined as "a restaurant theme that features meat and seafood or any other signature item of the existing Tadich Grill restaurant in San Francisco, California." (*Id*. at ¶ 1.27.)

United States District Court
Northern District of California

excess of 45 days after written notice of same." (Dkt. No. 46-1 at 157.) Section 11.3(b) provides

for termination of the agreement in the event "either party shall . . . generally not pay its debts as

they become due." (Dkt. No. 16-2 at ¶ 11.3(b).) The letter states that "[t]he License Agreement is

hereby terminated for reason of that breach." (Dkt. No. 46-1 at 157.) The letter also states,

however, that Plaintiff would reinstate the License Agreement if the default were cured by close of

business, September 29, 2017.

### 3. Restaurant Management Agreement

The Restaurant Management Agreement between Plaintiff, ICON, and TGDC engaged

ICON to manage Plaintiff's San Francisco Tadich Grill restaurant. (Dkt. No. 48-1 at 49.) Section

2.2 of the agreement provided ICON with a "limited license" to use Tadich Grill's intellectual

property for purposes of managing the San Francisco location. The section states, in its entirety:

> [Plaintiff Tadich Grill, Inc.] hereby grants to [ICON] a limited
> license during the term of this Agreement to use the Intellectual
> Property Rights underlying the TG Concept provided to [ICON] by
> [Plaintiff] for the sole purpose of performing [ICON's] obligations
> under this Agreement. "Intellectual Property Rights" shall mean all
> patents, copyrights, moral rights, trademarks, service marks, trade
> names, trade dress, trade secrets and any other form of intellectual
> property rights recognized in any jurisdiction, including without
> limitation, applications and registrations for any of the foregoing.

(*Id*. at ¶ 2.2.) On September 27, 2017, then-counsel for Plaintiff notified Defendants by letter that

TGDC was in breach of Section 6.3 of the agreement for failure to "reimburse Tadich Grill, Inc.

for the salary and benefits (including the employment taxes and other related employment costs

paid) for the replacement Local Manager for the Original Tadich Grill." (Dkt. No. 46-1 at 157.)

The letter states that "[t]he Management Agreement is hereby terminated by reason of that

breach," but it gave Defendants two days to cure the purported default and reinstate the agreement.

(*Id*.)

### B. The Washington, D.C. Restaurant

TGDC opened a Tadich Grill restaurant in Washington, D.C. in 2015. (Dkt. No. 36 at 5.)

The restaurant closed in January 2018. (*Id*.) On January 25, 2018, the members of TGDC—

Michael Buich and ICONcepts LLC—gave unanimous written consent, in accordance with the

Operating Agreement, to "discontinu[e] operations and commenc[e] a Chapter 7 bankruptcy

process."[8]  (Dkt. No. 26-5 at 2.)  According to Lauren Centioli, "the Tadich Grill restaurant in Washington, D.C. still has signs and displays on the front door and windows using the Tadich Grill mark."  (Dkt. No. 48 at ¶ 14.)

## C.    The Website

Pursuant to the License Agreement, in March 2009 Michael Buich transferred the registration of the Domain Name to Lauren Centioli "on behalf of TGDC."  (Dkt. No. 48 at ¶ 4); (*see also* Dkt. No. 26 at ¶ 19.)  In March 2012, TGDC launched the Tadich website ("Website") under the Domain Name.  (Dkt. No. 48 at ¶ 7.)  TGDC currently pays "the hosting fees, domain registration and other costs" associated with the Domain Name and Website.  (*Id*.)  According to Lauren Centioli, "TGDC does not receive any profit from the maintenance or use of the website." (*Id*.)

## D.    Tadich Grill Gift Cards

Following the January 2009 agreements, ICON implemented a "centralized gift card system for TGDC, which included the sale of gift cards through the Tadich Website and onsite at the Tadich Grill restaurant locations."  (*Id*. at 9.)  In a September-October 2011 email exchange including Gerard Centioli, Lauren Centioli, and Michael Buich, Lauren Centioli proposed the following regarding administration of the gift card funds:

> As I understand the initial discussion, the cost of the website is likely going to be paid by TGDC. Since a second restaurant is hopefully right around the corner, we're going to need to decide how the gift card funds are administered. Obviously, the restaurant where the redemption takes place will ultimately receive the funds, but I think it makes sense for TGDC to be the central repository of all internet and phone sales.

(Dkt. No. 48-1 at 98.)  Gerard Centioli agreed with the gift card proposal and Michael Buich was in "full agreement" as well.  (*Id*. at 97.)  According to the declaration of Lauren Centioli:

> Originally, when a consumer purchased a Tadich Grill gift card online, the order was routed to the general manager at the San Francisco restaurant, who would activate and deliver the gift card to

---

[8] Gerard Centioli asserts that on February 7, 2018, he "withdrew the consent of ICONcepts LLC to place TGDC in a Chapter 7 bankruptcy proceeding."  (Dkt. No. 47 at ¶ 26.)  Mr. Centioli insists that his "prior signature on the Unaminous Written Consent to place TGDC in bankruptcy was procured by fraud on the part of Michael Buich."  (*Id*.)

> the purchaser. The purchaser paid for the gift card online and that payment was directed to TGDC, which would ultimately reimburse the restaurant location where the gift card was redeemed.

(Dkt. No. 48 at ¶ 10.)  As of November 2017, "all three gift card sale locations (San Francisco, Washington, D.C. and the Tadich Website) were cash flow positive, meaning the value of gift cards purchased exceeded the value of gift cards received." (*Id.* at 11.)  Lauren Centioli states that "TGDC has a receivable from both the San Francisco and Washington, D.C. restaurants in the amount of their gift card sales less redemptions." (*Id.*)  Further, "TGDC has not received any payment for gift cards purchased on the Tadich Website since January 2018." (*Id.* at 13.)

### E.       Cease-and-Desist Letters

Plaintiff sent Defendants a cease-and-desist letter on March 12, 2018, demanding that TGDC:  (i) "Cease and desist from all current and future uses of the Tadich Grill name"; (ii) "Take down the website, tadichgrill.com, which per publicly available records, TGDC is the registrant organization"; and (iii) "Transfer the domain name, tadichgrill.com, to [Plaintiff]."[9] (Dkt. No. 27-2 at 2.)  The letter asserts that the License Agreement, and all rights to the Mark and domain name contained therein, terminated on July 1, 2011 pursuant to Section 11.2 of the license agreement, which provides that the license would terminate "without liability, at any time if Licensee [TGDC] fails to open the first Restaurant by June 30, 2011." (*Id.*) (quoting Dkt. No. 16-2 at ¶ 11.2.)  On March 14, 2018, Plaintiff sent Defendants two cease-and-desist letters demanding that ICON and ICONcepts, respectively, "immediately[ ] cease and desist from all current and future uses of [the Mark], including but not limited to the Tadich Grill signage and multiple uses of the Tadich Grill name that appear on the website, icon.com." (Dkt. Nos. 27-3 at 2 & 27-4 at 2.)  The next day, Plaintiff sent Defendants a cease-and-desist letter notifying them of Plaintiff's "inten[t] to hold Gerard Centioli and Lauren Centioli personally liable for the infringement of [the Mark]." (Dkt. No. 27-5 at 2.)  On April 24, 2018, Plaintiff renewed its demand to Defendants that they cease and desist from use of the Mark.  (Dkt. Nos. 27-6 at 2-4.)

Plaintiff alleges that the License Agreement's termination conditions are satisfied on

---

[9] Prior to June 7, 2018, all Defendants were represented by the same counsel.  (*See* Dkt. No. 56-8 at 4) (discussing TGDC's retention of its current counsel on June 7, 2018).

several grounds, yet TGDC and ICON continue to advertise the D.C. restaurant through the Website, control the domain name, and otherwise infringe the Mark.  (Dkt. Nos. 26 at ¶ 19 & 36 at 5.)  Defendants dispute that the License Agreement is terminated, and assert that its provisions remain in force.  (See Dkt. Nos. 45 at 22-26 & 49 at 2-7.)

### F.    Concurrent Litigation

In addition to the proceedings before this Court, the parties are involved in the following litigation: (i) judicial dissolution proceedings initiated on May 24, 2018 before the Superior Court for the State of Washington, King County, in *Buich v. Tadich Grill Development Company, LLC,* No. 18-13263-1-SEA ("*Buich v. TGDC*"); and (ii) action initiated by ICON against Tadich Grill, Inc. in October 2017 for breach of contract, concealment, negligent misrepresentation, and intentional interference with contract before the San Francisco County Superior Court in *ICON INC v. Tadich Grill, Inc.*, No. CGC-17-562008."  (See Dkt. Nos. 17 at 1-2, 17-1, 17-2.)[10]

## III.   Procedural History

On May 14, 2018, Plaintiff filed suit against Defendants alleging federal Lanham Act claims for: (1) trademark infringement, 15 U.S.C. § 1114; (2) cybersquatting, 15 U.S.C. § 1125(d); and (3) false designation of origin, 15 U.S.C. § 1125(a).  (Dkt. No. 1 at ¶¶ 21-31, 32-42, 43-48.)  In response, on June 29, 2018, Defendant TGDC filed a motion to compel arbitration, or in the alternative, transfer venue to the United States District Court for the District of Oregon.  (Dkt. No. 16.)  The non-TGDC Defendants filed a motion to dismiss on the same day.  (Dkt. No. 18.)

On July 3, 2018, Plaintiff moved for a preliminary injunction, seeking to: (i) "restrain[ ] Defendants, their members, officers, directors, principals, agents, servants, employees, successors and assigns, and all individuals acting in concert or participation with them, from using for any

---

[10] As discussed below, the Court takes judicial notice of these documents pursuant to Federal Rule of Evidence 201(b).  Additionally, pursuant to Civil Local Rule 7-3(d)(2), TGDC submitted a statement of recent decision in *Buich v. TGDC* in support of its motion to compel arbitration and opposition to Plaintiff's motion for preliminary injunction.  (Dkt. No. 63.)  The decision of the court in *Buich v. TGDC* vacates its previous order granting default judgment in favor of plaintiff, and orders plaintiff to file "all papers with the Washington Secretary of State to revoke or otherwise unwind[ ] the dissolution of TGDC, and to thereby restore TGDC to its prior status as an active Washington Limited Liability Company."  (*Id.* at 3.)

purpose whatsoever the "Tadich Grill" service mark, U.S. Registration Number 1066452 . . . and/or the Internet domain tadichgrill.com; and (ii) direct[ ] Defendants [TGDC], Gerard Centioli, Lauren Centioli or any other party in position to do so to transfer the internet domain, tadichgrill.com, back got Plaintiff." (Dkt. No. 30 at 4.) The non-TGDC Defendants filed a motion to stay on July 5, 2018, seeking to stay any "remaining claims against them" following resolution of their motion to dismiss "pending the conclusion of arbitration proceedings" between TGDC and Plaintiff. (Dkt. No. 31 at 3.)

## REQUESTS FOR JUDICIAL NOTICE

### I. TGDC

As a preliminary matter, TGDC requests that the Court take judicial notice of two court documents and their attached exhibits: (1) "A complaint filed by Michael Buich on or around May 24, 2018, in the Superior Court for the State of Washington, King County, in *Buich v. Tadich Grill Development Company, LLC*, No. 18-13263-1-SEA"; and (2) "A second amended cross-complaint filed in San Francisco County Superior Court on or around May 14, 2018 in *ICON INC v. Tadich Grill, Inc.*, No. CGC-17-562008." (See Dkt. Nos. 17 at 1-2, 17-1, 17-2.)

Pursuant to Federal Rule of Evidence 201(b), the Court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Judicial notice is appropriate for "undisputed matters of public record, including documents on file in federal or state courts." *Harris v. Cty. Of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (internal citation omitted); *see also Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002) ("We may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

Plaintiff has not opposed TGDC's request for judicial notice or otherwise disputed that the documents are in fact filings in the state actions. Accordingly, the Court grants TGDC's request for judicial notice.

### II. Non-TGDC Defendants

United States District Court
Northern District of California

The Non-TGDC Defendants request that the Court take judicial notice of two exhibits: (1) the initial complaint filed in San Francisco County Superior Court on October 19, 2017 in *ICON INC v. Tadich Grill, Inc.*, No. CGC-17-562008; and (2) the second amended complaint filed in same. (Dkt. No. 24.)  In line with the above, the Court grants judicial notice of the requested documents.

**III.    Plaintiff**

Plaintiff requests that the Court take judicial notice of sixteen exhibits submitted in support of its motion for preliminary injunction.  (Dkt. No. 28.)  The exhibits consist of records from the U.S. Patent and Trademark Office and Washington and Nevada Secretaries of State; court records from the United States Bankruptcy Court for the District of Columbia and Superior Court for the State of Washington, King County; multiple webpages as of July 1, 2018 from the tadichgrill.com, tadichgrillsf.com, and icon.com websites; and domain registration records as of July 1, 2018 for tadich.com, tadichgrill.com, and icon.com.  (Dkt. No. 28, Ex. 1-16.)  Plaintiff's exhibits are unopposed by Defendants, and otherwise comport with Rule 201(b); accordingly, the Court grants Plaintiff's request for judicial notice.

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction.  Fed. R. Civ. P. 65(a).  A preliminary injunction is an "extraordinary remedy."  *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  Alternatively, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (internal quotation marks and citation omitted).  A "serious question" is one on which the movant "has a fair chance of success on the merits."  *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984) (internal quotation marks

and citation omitted). The Ninth Circuit employs a sliding scale approach, wherein "the elements of the preliminary injunction test are balanced so that a stronger showing of one element may offset a weaker showing of another." _Alliance for the Wild Rockies v. Cottrell_, 632 F.3d 1127, 1131 (9th Cir. 2011).

Preliminary injunctions can be either prohibitory or mandatory. _Heckler v. Lopez_, 463 U.S. 1328, 1333-34 (1983). A prohibitory injunction prevents the nonmovant from taking action and thereby maintains the status quo pending resolution on the merits. _Id._ at 1333. Conversely, a mandatory injunction "orders a responsible party to take action." _Meghrig v. KFC W., Inc._, 516 U.S. 479, 484 (1996) (internal quotation marks and citation omitted). A mandatory injunction "goes well beyond simply maintaining the status quo. . . [and] is particularly disfavored." _Stanley v. Univ. of S. California_, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal quotation marks and citation omitted). "When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." _Id._ (internal quotation marks and citation omitted).

Here, Plaintiff seeks a mandatory preliminary injunction ordering that Defendants cease all use of the Mark and Domain Name, and transfer control of the latter to Plaintiff. As discussed in detail below, following the hearing on August 23, 2018, Defendants voluntarily took several actions regarding the Website and the ICON website. In light of Defendants' actions, the Court finds that a mandatory preliminary injunction is not warranted. However, the Court finds that a _prohibitory_ injunction is warranted to maintain the Website in its current form pending resolution on the merits.

## I.     A Preliminary Injunction Maintaining the Current Status Quo is Warranted

### A.     Serious Question Going to the Merits

Plaintiff's motion is based on its claims of trademark infringement, 15 U.S.C. § 1114; cybersquatting, 15 U.S.C. § 1125(d); and false designation of origin, 15 U.S.C. § 1125(a). The claims are predicated on allegations of the unauthorized use of the Mark and Domain Name. Plaintiff insists that it is likely to succeed on the merits of its claims because: (1) the License Agreement has been terminated on several grounds, and thus, TGDC's continued use of the Mark

and Domain Name is unauthorized; and (2) the non-TGDC Defendants are not party to the License Agreement, therefore any use of Plaintiff's intellectual property is unauthorized. The Court finds that Plaintiff has demonstrated that the continued validity of the License Agreement (and therefore, enforcement of its terms related to the Mark and Domain Name)[11] presents a "serious question" on which Plaintiff "has a fair chance of success on the merits." *See Sierra On-Line, Inc.*, 739 F.2d at 1421.

Plaintiff asserts that the License Agreement "was terminated on multiple grounds"; specifically, Sections 2.2 and 11.3(b), (f), (h), (i). (Dkt. No. 25 at 11-14.) Because the Court determines that Plaintiff has a fair chance of success of demonstrating termination under Section 11.3(h), it need address only that ground. Section 11.3 provides for termination of the agreement, in pertinent part:

> If either party shall . . . (b) generally not pay its debts as they become due, or (c) file a petition commencing a voluntary case under the Bankruptcy Reform Act of 1978, 11 U.S.C. Section 101 et seq., as amended or any successor statute thereto (the "Bankruptcy Code"), or (d) be adjudicated an insolvent, or (e) file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future statute, law or regulations, or (f) file any answer admitting or shall fail to deny the material allegations of such petition filed against it for such relief, or consent to the filing of any such petition or (g) seek consent to or acquiesce in the appointment of any agent, trustee, receiver custodian, liquidator or similar officer for it or for all or any substantial part of its assets or properties, or (h) *its directors or majority stockholders shall take any action authorizing any of the foregoing or looking to its dissolution or liquidation*, or (i) cease doing business as a going concern . . . this Agreement shall, at the option of the other party and upon written notice, terminate and be no further force or effect . . . ."

(Dkt. No. 16-2 at ¶ 11.3) (emphasis added.) Thus, the License Agreement provides for termination if either party or "its directors or majority stockholders shall take *any* action . . . looking to its dissolution or liquidation." (*Id.* at ¶ 11.3(h)) (emphasis added.) Email correspondence from December 2017 and January 2018 demonstrates that TGDC took such

---

[11] The Court recognizes that the non-TGDC Defendants are not signatories to the License Agreement, however, as discussed in Section III, the claims against all Defendants in this action are inextricably intertwined given the interrelatedness of the individual and corporate Defendants and the identical allegations against them.

action. On December 22, 2017, Gerard Centioli sent an email to Lauren Centioli, Michael Buich,

and Rick Powers discussing the retention of bankruptcy counsel from the law firm Clark Hill for

Tadich Grill of Washington DC LLC. Mr. Centioli writes, in pertinent part:

> I concur with Lauren's conclusion that Chapter 11 and 7 are the best options given where Tadich Grill of Washington DC LLC is today. While I would like to see the restaurant continue, determining which of those two (2) options is best will require the engagement and expertise of restructuring counsel. There will be a cost to either of those options and I remain willing to share my half of those costs as doing this right is paramount. We will also need legal counsel who can ensure that, if we end up closing the doors and laying off employees, we do so properly and in compliance with all legal requirements.
>
> Our agreement requires unanimous written consent by all managers for any decision of this magnitude.

(Dkt. No. 55-4 at 3.) Michael Buich responded that same day, stating, in part:

> While I am in favor of TGWDC retaining Clark Hill to investigate Chapter 7 and 11 proceedings, I do not agree unless they are also approved by all four Managers *to be retained to concurrently investigate Chapter 7 and 11 proceedings on TGDC as well, which has also been stated and proved to be insolvent*. Analyzing one without the other would be a wasted effort in my opinion.

(*Id.* at 2) (emphasis added.) Gerard Centioli responded later that evening with the following:

> Thank you Lauren, Rick and Mike for your votes regarding Tadich Grill of Washington DC LLC.
>
> *Given that Mike and I are the only votes required for [TGDC], I am providing my affirmative vote for Clark Hill to represent it for same.*
>
> Accordingly, both entities have unanimous consent.
>
> I will ask Clark Hill to provide us a scope and expense estimate ASAP.

(*Id.*) (emphasis added.) On December 26, 2017, Gerard Centioli emailed bankruptcy counsel from

Clark Hill, seeking an estimate for their services. The email states, in pertinent part:

> The Managers of Tadich Grill of Washington DC LLC (TGWDC) and [TGDC] have decided unanimously to engage [bankruptcy counsel] Clark Hill with the intent to enter into either Chapter 11 or Chapter 7 bankruptcy.
>
> Please provide us a scope and expense estimate for TGWDC *and* TGDC. As you know from our December 15 and 20 conference

calls, time is of the essence.

(Dkt. No. 55-2 at 2) (emphasis added.)  The email includes Michael Buich and Lauren Centioli as recipients.  On January 6, 2018, Lauren Centioli emailed Gerard Centioli, Michael Buich, and Rick Powers regarding Clark Hill's recommendations, stating, in part:

> Separately for TGDC, since Clark Hill suggested that a dissolution outside of bankruptcy may be preferable to bankruptcy, perhaps instead of engaging and paying a retainer for bankruptcy, we engage and pay a much lower retainer for such a recommendation.

(Dkt. No. 55-1 at 2.)  Thus, the correspondence supports Plaintiff's contention that TGDC took action "looking to its dissolution or liquidation."  The Court recognizes that such action ultimately resulted in the disputed unanimous written consent on January 25, 2018 authorizing Chapter 7 bankruptcy proceedings for TGDC, (Dkt. No. 26-5).  As previously noted, Defendants[12] insist that Gerard Centioli subsequently withdrew his consent to enter bankruptcy proceedings, "after learning that a lawyer who provided advice was representing Mr. Buich personally and not TGDC, as Mr. Buich informed him, and that bankruptcy was not in the best interest of TGDC."  (Dkt. No. 45 at 24); (*see also* Dkt. No. 47 at ¶ 26) (declaring that Mr. Centioli's "prior signature on the Unanimous Written Consent to place TGDC in bankruptcy was procured by fraud on the part of Michael Buich.")  However, the email correspondence suggests that Mr. Centioli consented to pursuing bankruptcy proceedings for TGDC on December 22, 2017, weeks before Mr. Buich retained the lawyer in question.[13]

Defendants also argue that termination under Section 11.3(h) "might also suffer from a

---

[12] Defendant TGDC joins in the non-TGDC Defendants' opposition to Plaintiff's motion for preliminary injunction.  (See Dkt. No. 49 at 2) ("Due to the extensive overlap in the issues collectively affecting TGDC and the [non-TGDC] Defendants, TGDC joins in the entirety of the [non-TGDC] Defendants' concurrent Opposition to the PI Motion, including all evidence submitted therewith.")  Thus, the Court refers simply to "Defendants" for purposes of Plaintiff's motion for preliminary injunction.

[13] In support of its motion for preliminary injunction, Plaintiff submitted the declaration of bankruptcy attorney Michael Baxter.  (Dkt. No. 57.)  Mr. Baxter declares, in part: "I was engaged by TGI and Mr. Buich on January 8, 2018."  (*Id*. at ¶ 2.)  Further: "On January 9, 2018, I participated in a telephone conference call with representatives from the law firm of Clark Hill[,] . . . Gerard and Lauren Centioli, Mr. Buich and Rick Powers.  During that call, we discussed potential bankruptcy of Tadich Grill of Washington DC LLC and [TGDC].  During this call, I was asked what my role was, and why I was on the call.  I responded by stating that I was counsel for Mr. Buich and TGI."  (*Id*. at ¶ 3.)

14

fatal legal flaw" because "the Bankruptcy Code prohibits terminating contracts based solely on provisions in a contract conditioned on 'the insolvency or financial condition of the debtor' or 'the commencement of a case under this title.'" (Dkt. No. 45 at 24) (quoting 11 U.S.C. § 365(e)(1)(A)-(B).) Defendants' argument is unpersuasive, and omits key language from the statute. The provisions of Section 365(e) apply "at any time *after* the commencement of the case." Plaintiff's theory of termination under Section 11.3(h) of the License Agreement is not premised on the *commencement* of a bankruptcy proceeding; instead, it is premised on the action "looking to" such proceedings.

Accordingly, the Court finds that Plaintiff has raised a serious question going to the merits of its claims—the continued validity of the License Agreement—and Plaintiff has demonstrated a fair chance of success on that issue.

### B.      Likelihood of Irreparable Harm

Having concluded that Plaintiff has a fair chance of success on the question of whether the License Agreement is terminated, the Court next turns to the question of irreparable harm. Under the *Winter* test, a plaintiff must show that irreparable harm is likely to result in the absence of an injunction. *Winter*, 555 U.S. at 24. A plaintiff seeking a preliminary injunction in trademark infringement cases must put forth evidence of irreparable harm, and cannot rely on conclusory or speculative allegations of harm. *Herb Reed Enter., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1248-52 (9th Cir. 2013).

Plaintiff asserts that it is likely to suffer irreparable harm because Defendants continue to operate and control the Website, thereby depriving Plaintiff "of the ability to control the information that is posted and associated with its name" with regards to: (i) the promotion of the now-closed Washington, D.C. restaurant and sale of gift cards for same; and (ii) "the promotion of a defunct partnership between Tadich and ICON." (Dkt. No. 54 at 15.) Plaintiff insists that its loss of control over the Website has deprived it of "the ability to control its business reputation and goodwill," resulting in "harm to reputation, damage to goodwill[,] and customer confusion." (*Id.*)

At the hearing on August 23, 2018, the Court indicated that Plaintiff had sufficiently

15

demonstrated a likelihood of irreparable harm based on its loss of control of the Mark and Domain Name in large part because the Website promoted a defunct restaurant.[14]  In response, Defendants filed a letter on August 27, 2018, indicating that they had voluntarily taken the following actions regarding the Website: (i) removed all references to the Washington, D.C restaurant; (ii) modified the link to the San Francisco restaurant by linking directly to Plaintiff's tadichgrillsf.com domain name; and (iii) agreed "to update basic business information (e.g. hours of operation, menus) on the Tadich Website as reasonably requested by Plaintiff."  (Dkt. No. 66 at 1-2.)  Defendants further made the following changes to the ICON website: (i) removed all references to the Washington, D.C. restaurant; and (ii) modified the site to feature its partnership with Plaintiff less prominently by automatically scrolling its homepage to feature each of its four partners at a timed interval.  (*Id.* at 2.)  The Court recognizes Defendants' efforts to address Plaintiff's concerns.  The Court finds, however, that a preliminary injunction is warranted to maintain Defendants' modifications.

Defendants' arguments to the contrary are unpersuasive.  First, Defendants' argument that Plaintiff improperly invokes a "presumption of irreparable harm" based on "a showing of likelihood of success on the merits," is incorrect.  (*See id.* at 16-17.)  Plaintiff's motion insists that "in this case, irreparable harm is more than just a presumption—it is a reality" based on Defendants' use of the Website to promote the defunct Washington, D.C. location.  (Dkt. No. 25 at 24.)  Defendants' second line of argument fails for the same reason—the Website's promotion of the Washington, D.C. restaurant is a "fact[ ] demonstrating irreparable harm."  Defendants insist that Plaintiff's allegations of harm are unsupported by evidence because "Plaintiff has not identified a single confused, 'frustrated,' or 'disappointed' customer or otherwise provided

---

[14] Prior to August 27, 2018, the Website promoted both the San Francisco and Washington, D.C. locations.  (Dkt. No. 28-10 at 2.)  The Website listed the hours of operation for the now-defunct Washington, D.C. restaurant, as well as its "availab[ility] for private parties," and solicited reservations and sells gift cards for the location.  (Dkt. No. 28-10 at 2, 14, 15.)  Given the ubiquity of internet access and use of web-based services, the Court found it highly likely that customers had sought to patronize the Washington, D.C. location based on the misleading information on the Website.  It follows that customers were likely frustrated with their experience upon learning that the restaurant is closed, and has been since January 2018.  Furthermore, it is likely that Plaintiff's business goodwill for the entire Tadich brand had been harmed as a result of that frustration because the Website promotes the San Francisco location as well.

competent evidence (such as a survey) that any consumers are in fact likely to be confused." (Dkt. No. 45 at 18.) Plaintiff need not do so; instead, Plaintiff must "proffer evidence sufficient to establish a likelihood of irreparable harm," *see Herb Reed*, 736 F.3d at 1251, and the Website's promotion of the defunct Washington, D.C. location constitutes such evidence. And although Defendants do not currently promote the Washington, D.C. location as of August 27, 2018, they have the ability to modify the Website given their continued control of the Domain Name.

Defendants' third line of argument—that Plaintiff "delayed far too long" in seeking a preliminary injunction—is also unpersuasive. (*See* Dkt. No. 45 at 21.) Defendants argue that Plaintiff's assertion of irreparable harm is flawed because Plaintiff failed to seek a preliminary injunction for (i) "more than nine months" after first notifying Defendants that the "License Agreement had terminated in September 2017"; (ii) "almost seven months" after the Washington, D.C. restaurant closed in January 2018; and (iii) "almost four months" after the March 2018 cease-and-desist letters. (*Id*.) Plaintiff counters that "[t]he irreparable injury did not fully manifest until after the [Washington, D.C.] restaurant closed in January 2018"; and further:

> [A]t the time of the DC restaurant bankruptcy, the parties had already agreed to a global mediation to commence February 13, 2018, which was immediately followed by a stipulated court ordered stay of litigation and a hold on any new non-bankruptcy litigation.

(Dkt. No. 54 at 15) (citing stipulated order in California state court action agreeing to stay "any new non-bankruptcy related litigation" until April 30, 2018, (Dkt. No. 56-1 at 3-5).) Thus, as a result of the stay, Plaintiff could not have sought injunctive relief prior to May 1, 2018. Plaintiff filed the instant action on May 14, 2018, and filed its motion for preliminary injunction seven weeks later on July 3, 2018. In explaining its delay, Plaintiff states that it "waited a reasonably brief amount of time" hoping "that as a result of filing the action, Defendants would voluntarily stop use of the Mark." (Dkt. No. 54 at 16.) The Court agrees that the seven-week delay is reasonable and does not undercut Plaintiff's assertion of irreparable harm or display the "lack of urgency" found in the cases cited by Defendant, (Dkt. No. 45 at 20). *See, e.g., Lydo Enters. Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984) (weighing four-month delay against plaintiff); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (five-month delay); *Balsam*

*Brands Inc. v. Cinmar, LLC*, No. 15-cv-04829-WHO, 2015 WL 7015417, at *10 (N.D. Cal. Nov. 12, 2015) (ten-week delay); *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1132-33 (S.D. Cal. 2014) (seven-month delay); *Cascade Fin. Corp. v. Issaquah Cmty. Bank*, No. C07-1106Z, 2007 WL 2871981, at *16-17 (W.D. Wash. Sept. 27, 2007) ("over-four-month delay").

Plaintiff has sufficiently demonstrated that its lack of control of the Mark and Domain Name is likely to cause irreparable harm if Defendants are not enjoined from modifying the Website from its current status as of August 27, 2018. *See Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, No. C 12-3856 PJH, 2014 WL 4312021, at *11 ("*Herb Reed* requires evidence that loss of control is likely to cause *harm* to the trademark holder."). Given that Defendants did not eliminate the references to the defunct Washington, D.C. restaurant until this Court indicated at the hearing that it would require it to do so, the Court cannot find that there is no likelihood that similar incorrect information will not be posted again. Accordingly, this factor weighs in favor of a preliminary injunction.

### C.      Balance of Hardships

The balance of hardships tips sharply in Plaintiff's favor. Defendants do not dispute that Plaintiff owns the Mark and Domain Name. Defendants do not dispute that they currently control the Domain Name and content of the Website pursuant to the terms of the License Agreement, the continued validity of which is hotly contested. Defendants do not dispute that Plaintiff owns the only currently-operating Tadich Grill restaurant—the original San Francisco restaurant—also promoted on the Website, and that the restaurant has been in the Buich family for over a century. These facts tip the hardships sharply in Plaintiff's favor because Plaintiff is the only party whose business goodwill is currently affected by the content of the Website and the only party with an undisputed claim to the Mark.

Conversely, the Court sees little hardship for Defendants if they are enjoined from modifying the Website pending resolution on the merits. Defendants argue that granting Plaintiff's requested relief would "upset[ ] the status quo by stripping Defendants of the right to use the [Mark] and [Domain Name] in the interim." (Dkt. No. 45 at 31.) Further, Defendants insist that "a preliminary injunction would stymie any attempt by Defendants at using the [Mark]

to attempt to continue to develop restaurants." (*Id*.) Defendants' arguments are unavailing. First, "the status quo" was upset in December 2017 and January 2018 upon the Washington, D.C. restaurant's closure and TGDC's unanimous consent to investigate dissolution and bankruptcy proceedings. As discussed previously, those events raise a serious question as to the continued validity of the License Agreement. Second, Gerard Centioli's declaration that TGDC has "every intention of resuming the mission of developing [Tadich Grill] restaurants as soon as it is practicable" fails to convince. (Dkt. No. 47 at 7.) During a Meeting of Creditors for Chapter 7 bankruptcy proceedings on April 5, 2018, Mr. Centioli testified that TGDC "still exists and it's how we hold our equity but [it] is not developing restaurants." (Dkt. No. 27-7 at 8.) In contrast, Plaintiff's Tadich Grill restaurant is currently operating, and has been since 1882.

### D. Public Interest

Given that the Court finds a serious question going to the merits based on the continued validity of the License Agreement, this element also weighs in favor of Plaintiff. Defendant argues that the "public interest is served by the enforcement of valid and binding contracts." (Dkt. No. 45 at 30) (citing *Puck v. Zwiener*, No. CV 08-3394 GAF (PLAx), 2008 WL 11339974, at *1 (C.D. Cal. June 20, 2008)). The Court agrees, and notes that the enforcement of a valid contract includes enforcement of its termination conditions if those conditions are triggered. Because Plaintiff has demonstrated a fair chance of success on that score, the public interest weighs in its favor.

***

Plaintiff has demonstrated that a preliminary injunction is warranted to maintain the status quo as to all Defendants as of August 27, 2018. If Defendants' Website is maintained as modified post-hearing, there is no irreparable harm to Plaintiff. Similarly, if ICON's website is maintained as to the Marks as configured on August 27, 2018, there is also no irreparable harm to Plaintiff. But given that Defendants did not modify either website to eliminate references to inaccurate information until *after* the preliminary injunction hearing, the Court cannot find that a preliminary injunction order is not warranted.

Accordingly, Defendants are ordered to maintain the Website in its current condition.

Defendants' counsel shall meet and confer with Plaintiff's counsel by Thursday, September 7, 2018 to confirm that the modifications are complete and that the public is no longer erroneously advised that the Washington, D.C. restaurant is still operating.  Further, to the extent Plaintiff asks TGDC to modify the Website to reflect changes to Tadich Grill's menu or operating hours, such changes must be made within 72 hours (excluding weekends and holidays) of the request.  No other modifications to the Website may be made absent further order of the Court.  Further, ICON's references to the Mark on its websites shall remain as in place on August 27, 2018 absent further order of the Court.  Such an injunction maintains the status quo while at the same time eliminating the likelihood of irreparable harm to Plaintiff's long-standing business.

## II.    Bond

Federal Rule of Civil Procedure 65 directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  District courts have discretion, however, "as to the amount of security required, if any."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (noting that "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion") (internal quotation marks and citation omitted).  "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

Defendants argue that a bond in the amount of $1,000,000.00 is necessary to avoid "the substantial harm that would occur to Defendants if the injunction is later found to be improper, including potentially the loss of Defendants' ability or opportunity to enhance the value of the bargained-for business relationship."  (Dkt. No. 45 at 31.)  Furthermore, Defendants insist— without providing any detail—that "given the several pending actions between the parties, the indefinite loss of use of contractual rights granted to TGDC may have adverse impacts on those other proceedings."  (*See id.*)  Plaintiff counters that a bond is not warranted because "TGDC has ceased doing business, the [D.C.] restaurant is shuttered and bankrupt, and the consent needed to

'develop' any new Tadich Grill restaurant will never be provided." (Dkt. No. 54 at 19.)

The Court agrees with Plaintiff. TGDC's Washington, D.C. restaurant is closed and undergoing Chapter 7 bankruptcy proceedings. As of April 2018, Gerard Centioli testified that TGDC "is not developing restaurants," (Dkt. No. 27-7 at 8), and Michael Buich has declared that there is "no possibility [Plaintiff] will ever consent to develop a new Tadich Grill with Defendants," (Dkt. No. 55 at 3). Simply put, the Court fails to see what "harm" to Defendants a bond would protect against if the preliminary injunction is later found to have been granted in error. Accordingly, Defendants' request for a bond is denied.

## TGDC'S MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2-16 provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." Under the FAA, "arbitration agreements [are] on an equal footing with other contracts," and therefore courts must "enforce them according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citations omitted). A party may petition a court to compel "arbitration [to] proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The United States Supreme Court recognizes a "liberal policy favoring arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). However, "a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted).

"Generally, in deciding whether to compel arbitration, a court must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Here, there is no dispute as to the first gateway issue: the parties agree that there is an agreement to arbitrate. However, the parties contest whether the arbitration agreement covers this dispute.

21

## A. The Arbitrator Must Decide Arbitrability

TGDC argues that Plaintiff's claims must be compelled to arbitration because they arise from the License Agreement as they are premised on Plaintiff's assertion that the License Agreement is terminated—an assertion borne out by the Court's discussion of Plaintiff's motion for a preliminary injunction. Plaintiff counters that its trademark claims are expressly carved out from the arbitration requirement, and therefore this Court, and not an arbitrator, must decide the claims, even if a threshold issue is whether the License Agreement is terminated. The first question the Court must address, however, is whether it can decide the question of arbitrability, that is whether Plaintiff's claims are covered by the arbitration agreement, or whether the License Agreement delegated that question to the arbitrator.

"[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). However, an agreement to arbitrate arbitrability must be clear and unmistakable, "otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs.*, 475 U.S. at 649. Under binding Ninth Circuit law, an agreement's incorporation of the American Arbitration Association's ("AAA") rules "constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 (9th Cir. 2013) ("[A]s long as an arbitration agreement is between sophisticated parties to commercial contracts, those parties shall be expected to understand that incorporation of the [arbitrator's] rules delegates the questions of arbitrability to the arbitrator.").

Here, the broadly-worded arbitration clause states that "[a]ny controversy arising out of or relating to this Agreement shall be resolved by arbitration," and that such arbitration shall be "pursuant to the commercial rules of arbitration as prescribed by the American Arbitration Association." (Dkt. No. 16-2 at ¶ 16.2(a).) Section 16.2's incorporation of the AAA rules clearly and unmistakably shows that the parties delegated the threshold issue of arbitrability to the arbitrator. Indeed, the language tracks the delegation language recommended by the American

22

Arbitration Association. *See* American Arbitration Association, *A Guide to Commercial Mediation and Arbitration for Business People*, 16 (2013), https://www.adr.org/sites/default/files/document_repository/A%20Guide%20to%20Commercial.pdf ("Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules . . . .").

Plaintiff counters that the parties did not "clearly and unmistakably" agree to arbitrate the issue of arbitrability because Section 16.4 provides a carve-out for the specific claims at issue. Section 16.4 states, in pertinent part, "[T]he obligation herein to arbitrate shall not be binding upon either party with respect to claims relating to the Licensed Mark or any copyright." (Dkt. No. 16-2 at ¶ 16.4.) Plaintiff insists that the carve-out under Section 16.4 applies because the underlying claims concern the Licensed Mark as defined by the License Agreement (i.e., intellectual property rights in the name "Tadich Grill" and the domain name "tadichgrill.com"). Plaintiff argues that as a result, "it is plain that, or at least ambiguous whether, the issue of whether Tadich Grill's claims are arbitrable is to be decided by the Court." (Dkt. No. 36 at 12.)

The Court disagrees. In *Oracle*, plaintiff argued against delegation of arbitrability based on a similar carve-out providing that "either party may bring any action, in a court of competent jurisdiction (which jurisdiction shall be exclusive), with respect to any dispute relating to such party's Intellectual Property Rights" arising out of the underlying agreement. *Oracle*, 724 F.3d at 1075-76. The court rejected that argument, noting that it "conflates the *scope* of the arbitration clause, i.e., which claims fall within the carve-out provision, with the question of *who* decides arbitrability." *Id*. at 1076. ("The decision that a claim relates to intellectual property rights or compliance with the TCK license constitutes an arbitrability determination, which the parties have clearly and unmistakably delegated to the arbitrator by incorporating the [arbitrator's] rules.") *Id*.

Similarly here, Section 16.4's carve-out applies to the scope of the arbitration provision; it does not govern who decides whether a particular claim falls within that scope. Thus, Section 16.4 does not invalidate the clear and unmistakable delegation of arbitrability to the arbitrator based on the parties' incorporation of the AAA rules.

Plaintiff also points to the severability provision under Section 16.6, which states, in its entirety:

> The provisions of this Article 16 shall be construed as independent of any other covenant or provision of this Agreement; provided that if a court of competent jurisdiction determines that any such provisions are unlawful in any way, such a court shall modify or interpret such provisions to the maximum extent necessary to have them comply with the law.

(Dkt. No. 16-2 at ¶ 16.6.) Plaintiff argues that because "Section 16.6 acknowledges the possibility that a court may rule on the enforceability of the arbitration clause, it does not make sense for TGDC to suggest that the License Agreement unambiguously delegates the issue of arbitrability to the arbitrator." (Dkt. No. 36 at 13.)

The Court disagrees. The severability provision under Section 16.6 merely assigns to a court of competent jurisdiction a power that the arbitration provision in Section 16.2 expressly declines to extend to arbitrators: "The arbitrators sitting in any such controversy shall have no power or jurisdiction to alter or modify any express provision of this Agreement or to make any award, which by its terms, affects any such alteration or modification." (Dkt. No. 16-2 at ¶ 16.2(a).) Section 16.6 assigns that power to a court of competent jurisdiction. Section 16.6 does not stand for the proposition that arbitrators are without jurisdiction to determine *arbitrability* in the first instance—as provided under the AAA rules; instead, it says only that the arbitration provisions in Article 16 are independent of the License Agreement, and are thus unaffected by a court's determination of the *lawfulness* of the License Agreement's provisions. It is thus unsurprising that other courts in this district have found that similar severability provisions do not invalidate clear and unmistakable delegation provisions. *See, e.g., MegaCorp Logistics LLC v. Turvo, Inc.*, No. 18-cv-01240-EMC, 2018 WL 3619656, at *6 (N.D. Cal. July 30, 2018) (severability provision stating that "if any provision of the contract is held by a court of competent jurisdiction to be unenforceable, then the validity of the remaining provisions shall not be affected," did not invalidate clear and unmistakable delegation of arbitrability to the arbitrator); *McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036-JD, 2017 WL 4551484, at *4 (N.D. Cal. Oct. 11, 2017) (severability provision stating that "[i]f for any reason a court of competent jurisdiction

finds any provision of these Terms invalid or unenforceable, that provision will be enforced to the maximum extent permissible and the other provisions of these Terms will remain in full force and effect," did not invalidate delegation by incorporation of AAA rules)*; Miller v. Time Warner Cable Inc.*, No. 8:16-cv-00329-CA, 2016 WL 7471302, at *4 (N.D. Cal. Dec. 27, 2016) (provision providing that "[i]f a court or similar body determines that a portion of [the agreement] is invalid or unenforceable the rest of the agreement should stand," did not invalidate delegation by incorporation of AAA rules); *see also Mohamed v. Uber Techs., Inc*., 848 F.3d 1201,1209 (9th Cir. 2016) (reversing the district court and holding that arbitration carve-outs and "venue provisions granting state and federal courts in San Francisco 'exclusive jurisdiction' over 'any disputes, actions, claims or causes of action arising out of or in connection with [the] Agreement" did not invalidate clear and unmistakable delegation clause).

The cases cited by Plaintiff are either distinguishable on their facts or rely on *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185 (N.D. Cal. 2015), which was expressly reversed and remanded on the same grounds by the Ninth Circuit, *see Mohamed*, 848 F.3d at 1209-12. *See Vargas v. Delivery Outsourcing, LLC*, No. 15-cv-03408, 2016 WL 946112, at *7 (N.D. Cal. Mar. 14, 2016) (citing *Mohamed*, 109 F. Supp. 3d at 1199-2000, and later concluding that incorporation of AAA rules "does not evince 'clear and unmistakable' intent to delegate disputes involving unsophisticated employees" like plaintiff, "an unsophisticated luggage delivery driver" with disputed "English language proficiency"); *Levi Strauss & Co. v. Aqua Dynamics Sys., Inc.*, No. 15-cv-04718, 2016 WL 1365946, at *7-8 (N.D. Cal. Apr. 6, 2016) (citing both *Vargas*, 2016 WL 946112, at *6-7, and *Mohamed*, 109 F. Supp. 3d at 1198); *Parada v. Super. Ct.*, 176 Cal. App. 4th 1554, 1565-66 (2009) (finding incorporation of arbitrator's rules not clear and unmistakable evidence of delegation of specific issue of unconscionability where severability provision did not reserve "to the arbitration panel the issue whether [the] arbitration provisions were unenforceable").

Section 16.2's incorporation of the AAA rules constitutes clear and unmistakable evidence that the parties intended to arbitrate the issue of arbitrability. Accordingly, this action must be compelled to arbitration where the arbitrators will decide in the first instance whether this is an

25

action arising out of the License Agreement or whether the carve out for claims relating to the Licensed Mark means that there is nothing for the arbitrators to decide.

## B.     Stay of Proceedings

Under Section 3 of the FAA, a stay is mandatory as to the parties to the arbitration agreement—here, Plaintiff and TGDC. *See* 9 U.S.C. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . [the court] shall on application of one of the parties stay the trial action until such arbitration has been had."). Plaintiff does not dispute that if the Court grants TGDC's motion to compel arbitration, then the Court must stay its claims against TGDC.

## NON-TGDC DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the non-TGDC Defendants move to dismiss with prejudice: (i) "any" cybersquatting claim under 15 U.S.C. § 1125(d) "relating to the ICON Domain"; and (ii) the cybersquatting claim "relating to the Tadich Domain (or at least the the [cybersquatting] claim relating to the Tadich Domain as against defendants ICON INC, ICONcepts LLC and Gerard Centioli)." (Dkt. No. 18 at 9.) Alternatively, the non-TGDC Defendants "seek an order requiring Plaintiff to provide a more definite statement" pursuant to Federal Rule of Civil Procedure 12(e). (*Id.* at 3.)

The non-TGDC Defendants also move to stay any remaining claims against them following the Court's order regarding their motion to dismiss and pending resolution of arbitration between TGDC and Plaintiff. (Dkt. No. 31.) Defendants assert in their motion to stay that "[t]he claims required to be arbitrated by the [Plaintiff]-TGDC License Agreement are identical to the claims [Plaintiff] alleges against [the non-TGDC] Defendants." (Dkt. No. 31 at 3.) Furthermore, the non-TGDC Defendants note "that there are questions of fact common both to the parties involved in the arbitration and those involved in the litigation," and that "Plaintiff's claims against the [non-TGDC] Defendants and TGDC are inextricably intertwined" because the complaint "alleges materially identical allegations against all defendants" solely concerning the Tadich Grill mark and domain name, and "do[es] not differentiate between any individual defendant." (Dkt. No. 31 at 4.) In other words, Defendants argue that a stay is warranted pending arbitration

because the facts, allegations, and claims asserted against the non-TGDC Defendants are identical to those against TGDC.

The Court has discretion to grant a stay pending completion of arbitration as to the non-TGDC Defendants, who are not parties to the arbitration agreement. *See Moses H. Cone Hosp. v. Mercury Contr. Corp.*, 460 U.S. 1, 20 n.23 (1983) ("[I]t may be advisable to stay litigation among the nonarbitrating parties pending the outcome of arbitration. That decision is one left to the district court . . . as a matter of discretion to control its docket.") In determining whether a stay is warranted, a court must weigh "the competing interests which will be affected by the granting or refusal to grant a stay." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citation omitted). Those interests include "the possible damage which may result from granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Id.*

On balance, and with the "orderly course of justice" weighing heaviest, the Court agrees with the non-TGDC Defendants that a stay is warranted. Further, ruling on the non-TGDC Defendants' motion to dismiss prior to arbitration may lead to inconsistent findings given the interrelatedness of the Defendants[15] in this action, and because Plaintiff's complaint does not differentiate between the conduct of TGDC and the non-TGDC Defendants, but instead asserts the same claims against *all* Defendants. *See Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 842 (N.D. Cal. 2007) ("[I]f a suit against a nonsignatory is based upon the same operative facts and is inherently inseparable from the claims against the signatory, the trial court has discretion to grant a stay if the suit would undermine the arbitration proceedings and thwart the federal policy in favor of arbitration.") (internal quotation marks and citation omitted). Thus, the Court finds that "[c]onsiderations of economy and efficiency fully support" staying all

---

[15] Plaintiff recognizes the interrelatedness of all Defendants, referring to "the agency relationships that exist among the Defendants," (Dkt. No. 25 at 11 n.3), and asserting that "[t]he common thread in Defendants' exceedingly complicated corporate structure are the Messrs. Centioli, who have the authority and ability to stop the infringement of the Mark on behalf of themselves and TGDC, ICON, and ICONcept but have chosen not to," (*id.* at 10).

proceedings because the claims against all Defendants are inextricably intertwined. *See Newton v. Neumann Caribbean Int'l., Ltd.*, 750 F.2d 1422 (9th Cir. 1985) (affirming district court's stay of all proceedings pending arbitration where it was "clear that there were ample reasons for avoiding duplication of effort in trying simultaneously, or even successively, the issues presented in" claims against different parties involving the same operative facts).

Plaintiff's primary argument against granting a stay—that it will be harmed because it "is actively seeking injunctive relief" (Dkt. No. 43 at 3-5)—is rendered moot by this Order's grant of a preliminary injunction. Plaintiff's further argument—that arbitration has no bearing on its claims against the non-TGDC Defendants because they are not party to the License Agreement— is undermined by Plaintiff's own allegations concerning the interrelatedness of the Defendants, and the inextricably intertwined claims against all Defendants.

First, Gerard Centioli is a signatory to the License Agreement as the "President & CEO" of TGDC. Thus, the provisions of the License Agreement apply to Mr. Centioli. Second, the interrelatedness of TGDC and Defendants ICON, ICONcepts, and Lauren Centioli is referenced repeatedly in Plaintiff's complaint. For example, Plaintiff notes that Gerard Centioli is president and CEO of ICON and ICONcepts, the latter of which "owns or controls" 75 percent of TGDC. (Dkt. No. 1 at ¶¶ 5-7.) Plaintiff further alleges that "each of the Defendants was the agent of all other Defendants, and was, in doing the things here complained of, . . . responsible in some manner for the occurrences" alleged in the complaint.[16] (*Id.* at ¶ 8.) The complaint also characterizes "Defendants Gerard Centioli and Lauren Centioli as the responsible individuals and decision makers for TGDC, ICON and ICONcepts . . . ." (*Id.* at ¶ 18.)

Given the interrelatedness of TGDC and the non-TGDC Defendants, and the claims against all Defendants alleging identical conduct concerning the Mark and Domain Name contemplated by the License Agreement, the Court finds that a stay is warranted pending

---

[16] In response to this particular allegation, the non-TGDC Defendants state that "[i]f true, then the [non-TGDC] Defendants might be considered to be 'Affiliates' of TGDC under the License Agreement, which grants TGDC 'an exclusive, perpetual, irrevocable, sublicensable license . . . to Use the Licensed Mark . . . for the Business Purpose,' which is itself broadly defined to include activities by Affiliates. (Dkt. No. 31 at 4) (quoting Dkt. No. 16-2 at ¶ 2.1(a).)

completion of arbitration. *See Sharp Corp. v. Hisense USA Corp.*, No. 17-cv-03341-YGR, 2017 WL 6017897 (N.D. Cal. Dec. 5, 2017) (granting stay of claims against non-signatory defendants pending arbitration of license agreement where "the claims against the defendants . . . all arise from the identical conduct, and are intertwined.").

Accordingly, the Court grants the non-TGDC Defendants' motion to stay all proceedings pending completion of arbitration.

## CONCLUSION

In line with the foregoing, the Court GRANTS in part Plaintiff's motion for preliminary injunction. Defendants are enjoined from making any modifications to the Website pending resolution on the merits, except in response to reasonable requests by Plaintiff to update basic business information concerning the San Francisco restaurant's hours of operation and menu changes. Such changes must be made within 72 hours (not counting weekends or holidays) of the request, unless the parties agree otherwise.

The Court GRANTS TGDC's motion to compel arbitration based on the parties' agreement to conduct resolution of their dispute in accordance with the AAA rules. Accordingly, any further proceedings in this action are stayed pursuant to 9 U.S.C. § 3. The parties shall jointly file a report on the status of the arbitration proceedings within six months of the date of this Order.

The Court GRANTS the non-TGDC Defendants' motion to stay proceedings pending resolution of arbitration between TGDC and Plaintiff. The Court dismisses without prejudice the non-TGDC Defendants' motion to dismiss; the motion may be renewed, if necessary, following the lifting of the stay.

This Order disposes of Docket Nos. 16, 18, 25, 31.

**IT IS SO ORDERED.**

Dated: August 28, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge